## Richmond

## CONNER, ET ALS V. WEST, RECEIVER FOR BRICKHOUSE BANKING CO., INC.

### January 20, 1921.

1. BANKS AND BANKING—*Cashier's Bond—Liability of Sureties— Whether Bond Limited to a Particular Period or a Continuing Liability—Case at Bar.*—A cashier's bond was conditioned that the cashier should well and truly serve the bank, and should not "during his incumbency" embezzle, make away or lend any of the funds of the bank without authority, but should deport himself honestly with all the funds that should pass through his hands "during his term of service."

   *Held:* That the liability of the sureties on the bond was not limited as to duration to any particular year or other period of the service of the cashier, but was a continuing liability during the whole term of service of the cashier from the time when the bond was given until the end of such service.

2. CONTRACTS.—*Construction—Practical Construction—Case at Bar.* —In the instant case the court was strengthened in its opinion that the cashier's bond covered a continuing liability during the whole term of the cashier's service by the fact that the evidence showed that such was the contemporaneous mutual construction of the bond by both the bank and the sureties, up to the end of the service of the cashier.

3. BANKS AND BANKING—*Cashier's Bond—Liability of Sureties— Whether Bond Limited to a Particular Period or a Continuing Liability—Case at Bar.*—In an action against sureties on a cashier's bond, where the liability of the sureties was a continuing one during the whole term of service of the cashier, the refusal of the trial court to admit oral evidence to show that the cashier's resignation was tendered and accepted, if error, was harmless, where if the resignation was tendered and accepted, another contract of employment, either express or implied, was, *eo instante,* made between the bank and the cashier, in such a way that his services as cashier were not for a moment interrupted, but were continuous from the time the bond was given until the liability in judgment was incurred.

4.  BANKS AND BANKING.—*Sureties on Cashier's Bond—Release of Debtor.*—The release by the receiver of a bank, without the consent of the sureties on the cashier's bond, of the mere personal liability of a third party to the bank, for an overdraft for which the cashier was also liable to the bank, did not release the sureties of the cashier from such liability.

5.  SURETYSHIP.—*Release of Debtor as Release of Surety.*—A release of the principal debtor by the creditor, by an absolute release of the debt, or by an obligatory extension of the time of payment, without the consent of the surety, releases the surety *in toto.*

6.  SURETYSHIP.—*Release of Debtor as Release of Surety—Release of Lien.*—A release by the creditor, without the consent of the surety, of any perfected lien or fund or property held by the creditor in such a way that he has the legal right to apply it in satisfaction of the whole or any part of the debt, releases the surety *pro tanto, i. e.*, to the extent of the amount which could with certainty, as appeared at the time of the release, have been realized from the security.

7.  SURETYSHIP.—*Creditor's Release of Debtor—Collateral Personal Obligation—Subrogation.*—The release by the creditor of a mere collateral personal obligation, even of the principal debtor, and *a fortieri* of such an obligation of some third person, without the consent of the surety, does not release the surety, even *pro tanto.* The right of subrogation does not extend to mere personal collateral obligations.

8.  SURETYSHIP.—*Release of Securities by Creditor.*—Concerning what character of collateral securities in the hands of a creditor cannot be released, without the consent of the surety, without releasing the surety, the better opinion is that it must be a mortgage, pledge or lien—some right to or interest in property which the creditor can hold in trust for the surety, and to which the surety if he pays the debt can be subrogated, and the right to apply or hold must be absolute.

Error to a judgment of the Circuit Court of Northampton County, in a proceeding by motion for a judgment for money.  Judgment for plaintiff.  Defendants assign error.

*Affirmed.*

This is an action at law by the defendant in error (hereinafter called the receiver), on the bond, which is not dated, given by the plaintiffs in error (hereinafter called sure-

ties), to the bank, in the penalty of $5,000.00, conditioned for the performance by one J. T. Turner, then cashier of said bank, of "the duties appertaining to a cashier," which duties and the stipulated duration of the obligation of the bond are specifically set forth in the bond itself, as follows: "Now the conditions of this bond is such: That if the said T. J. Turner shall well and truly serve the said Brickhouse Banking Company, Incorporated, and shall not during his incumbency retain, convert, waste, embezzle, make away or lend any of the funds of the said * * * * company * * * *, without authority from proper officials, but shall deport himself honestly with all the funds that may pass through his hands belonging to the above named * * * * company * * * *, during his term of service, then this bond or obligation is to be void, otherwise to remain in full force."

There was a trial by jury resulting in a verdict and judgment against the sureties for $4,070.85 with interest and costs.

The material fact and issues are as follows:

The said J. T. Turner served as cashier of the bank, continuously and without interruption, from March 7, 1911, to May 29, 1917, when the receiver qualified as such and took in hand the assets and affairs of the bank.

The minutes of the board of directors of the bank read in evidence show that on March 7, 1911, "J. T. Turner was elected cashier," and that annually thereafter he was re-elected cashier. The minutes also show that at the meeting of the board of directors on September 7, 1911, the amount of the cashier's bond was on that date "reduced from $10,-000.00 to $5,000.00," although, it seems, no cashier's bond had been given up to that time.

The record does not show precisely when the bond of the sureties aforesaid was given to the bank; but it was signed by two of the sureties, Conner and Savage, and first de-

livered as the bond of these two only, some time prior to July 2, 1912, as the record shows that in the minutes of the board of directors meeting on July 2, 1912, such bond is referred to as having been executed and delivered to the bank, and a committee was at that meeting appointed "to look into the financial standing of the cashier's bondsmen." Kelley signed the bond as surety on September 3, 1912, as it would seem, as it appears in evidence that the minutes of the board of directors meeting of such date contains the following entry: "On motion of T. D. Jefferson, second by Peter Bivens, James Kelly was taken as additional surety on the cashier's bond."

The record shows that at the meeting of the board of directors on November 2, 1916—"Bond of cashier was read and the president was ordered to see the parties who signed by mark and a witness to their signature." The president accordingly took the bond to each of the three sureties aforesaid, and, as the president testifies, "exhibited said paper and inquired of them whether they had executed the same as Turner's sureties, and was assured by each of them that they had done so;" and this action of the president was reported by him to the meeting of the board of directors on January 4, 1917, as appears from the minutes of that meeting. The record shows that two of the sureties signed the bond by mark, the other by his signature. All three of the sureties, however, testified in the case as witnesses in their own behalf and neither of them controverted the accuracy of the testimony of the president aforesaid on the subject of his having visited each of them and of his having asked them, between November 2, 1916, and January 4, 1917, whether they had executed the said bond "as Turner's sureties," and that he was answered by each of them, "that they had done so," as aforesaid.

There is a conflict in the oral testimony in behalf of the respective parties on the subject of whether the cashier, at

the board of directors meeting on May 7, 1914, tendered his resignation in writing—there being testimony for the receiver to the effect that no resignation of the cashier was ever tendered, and testimony for the sureties to the effect that a resignation of the cashier in writing was sent in to the board of directors at its May meeting in 1914. The record is silent as to whether this resignation, if sent in to the board of directors, was conditional or unconditional.

There is also an issue made in the case as to whether the resignation aforesaid, if tendered, was accepted by the board of directors. On this issue certain oral testimony was introduced on behalf of the receiver to the effect that if the resignation was ever tendered to the board of directors it was never accepted. And the sureties offered certain oral testimony to the effect that the resignation was accepted at the said May meeting of the board in 1914, which the trial court refused to allow the sureties to introduce, and this is made the basis of several assignments of error.

It appears in evidence that the minutes of the directors' meeting of May 7, 1914, show an entry which is as follows: "On motion by W. H. Matthews, seconded by L. Treherne, that the cashier's statement concerning his resignation not be considered. Motion lost." That another portion of the minutes of the same meeting show the following entry: "On motion by T. D. Jefferson, second by D. R. H. Allen, the cashier is directed to bring into the board of directors a report of the financial condition of the bank from the time he took charge of the bank to June 1, 1914." On the minutes of the meeting of the board of directors on June 4, 1914, appears the following entry: "Next reading of the cashier's report on motion of L. Treherne and seconded by T. D. Jefferson that report be received. Carried."

And there is other evidence, which is undisputed, to the effect that said cashier served as cashier of the bank continuously, as aforesaid, from March 7, 1911, to May 29,

1917, without any interval of time during that period when he was not acting and considered by the bank and by himself as being in the employment and service of the bank as cashier; and that no security, other than the said bond was ever given to the bank for the faithful performance of his duties by said cashier, and none other asked by the bank during the whole period of his service as cashier.

The breach of duty of the cashier from which the liability arose which is covered by the judgment under review occurred after May 7, 1914, when the sureties claim the resignation of said Turner as cashier was tendered and accepted; or if not accepted, certainly tendered as they claim, as aforesaid.

Among the liabilities of said cashier to the bank, which existed prior to this suit, were two overdrafts, one, of one R. B. Upshur for $3,467.68 and the other of a partnership firm of R. B. Upshur & Company for $1,329.31. The partner, who, with R. B. Upshur, composed this firm, was insolvent and wholly irresponsible financially. R. B. Upshur owned several parcels of real estate, the largest and most valuable of which was sold under a deed of trust after the bank went into the hands of the receiver, and all of these parcels of land were encumbered with deeds of trust, in several instances overlapping each other, and it was extremely doubtful whether a judgment even for the individual overdraft of said Upshur could be realized by legal process. Upshur's most valuable asset was a bond of a debtor of his for $2,500.00 payable to Upshur and secured by a deed of trust, but this could have been assigned by Upshur and thus perhaps could have been placed out of the reach of his creditors. Two suits by the receiver to recover the amounts of said overdrafts were pending in court and set for trial. On the day of the trial, Upshur by counsel offered to confess judgment for the individual overdraft of himself if the receiver would accept the same in full compro-

mise settlement of the two suits and withhold execution thereon 'till October 1, 1918. To this proposition the receiver replied that if Upshur would assign said $2,500.00 bond to him as security for the payment of such judgment he would accept the offer; being of opinion, upon the advice of counsel, that such a settlement was for the best interest of all interested in realizing as much as possible from Upshur and Upshur & Co. Accordingly the assignment of the $2,500.00 bond was made to the receiver by Upshur and the compromise settlement was consummated; the effect of which was to release Upshur and his insolvent partner in the firm of Upshur & Co. from all liability for the $1,329.31 Upshur & Co. overdraft. By the time of the trial in the court below of the instant case the amount which had been realized on execution upon the judgment against Upshur, together with the amount which could be realized on the $2,500.00 bond, rendered certain the payment in full of the judgment and the relief of said sureties to that extent. So that $3,467.68 of the original liability of the cashier was not included in the amount of said judgment against the sureties. But the said overdraft of Upshur & Co. for said sum of $1,329.31 was included in the amount of such judgment.

The compromise settlement aforesaid was made without consultation with and without the consent of said sureties. They do not claim that anything more, if so much, could have been realized out of Upshur or his partner or out of any property of theirs *in esse* at the time of the settlement, if the receiver had not compromised as aforesaid and had obtained judgment for the amounts of both overdrafts; but that the release of Upshur and his partner from the personal obligation of the said sum of $1,329.31 overdraft, without the consent of the sureties, by operation of law released the sureties *in toto* from that amount of their obligation to the bank.

The record shows that the said cashier was by said compromise in no way released from his liability to the bank for said $1,329.31 overdraft.

· *Mapp & Mapp* and *John E. Nottingham,* for the plaintiff in error.

*N. B. Wescott* and *S. James Turlington,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented by the assignments of error, which are involved in the decision of the case will be passed upon in their order as stated below.

[1]  1. Was the bond of the sureties for the cashier limited as to the duration of its obligation to any particular year or other period of the service of the cashier; or did it cover a continuing liability during the whole term of service of the cashier from the time when the bond was given until the end of such service May 29, 1917?

The first portion of this question must be answered in the negative; the latter portion in the affirmative.

We have no hesitancy in saying that, from the face of the bond itself, this is the proper construction of it.

In view of our construction of the bond, it is immaterial that the cashier was employed by the year, or whether he was an officer or merely an employee of the bank. In any case the length of time he might continue in the service of the bank was dependent upon the will of the board of directors of the bank as evidenced by their entering for the bank into contract or contracts with the cashier for his service. And there is nothing in the terms of the bond which limits the duration of its obligation to the period of any particular contract of service of the cashier. Certainly it is not limited to a period of one year; nor, to a period of two

years; nor, as we think, to any period short of the cessation of the service of the cashier. Plainly the bond was given and accepted as a continuing obligation to cover the whole period during which the cashier might remain continuously in the service of the bank.

[2] We are strengthened in opinion that this view is correct by the fact that the evidence shows that such was the co-temporaneous mutual construction of the bond by both the bank and the sureties, up until the end of the services of the cashier and the appointment of the receiver. The bank unquestionably relied all along on the bond as a continuing obligation. And the fact that the bank was relying upon this bond as a continuing obligation of suretyship for the faithful discharge of his duties by the cashier, was undoubtedly brought to the attention of all three of the sureties by the president of the bank in the latter part of the year 1916 by his interview with them at that time, the manifest object of which was to ascertain the status of the bond as a continuing obligation, and they all three acknowledged in substance the existence of their obligation under the bond "as Turner's sureties;" and not until after this suit was instituted ever raised any question as to its being a continuing obligation.

See *Elam* v. *Bank*, 86 Va. 92, 9 S. E. 498, for the holding that the cashier's bond there involved was a continuing obligation covering successive years of service, to which the cashier was annually re-elected from year to year—the statute law referred to in that case being similar to Code 1887, sec. 1120, 1157, Acts 1902-3-4, p. 906, in existence during the period covered by the bond in the instant case.

The cases of *U. S.* v. *Wright*, Fed. Cas. No. 16, 775, 1 McLean 509; *Gilbert* v. *Luce*, 11 Barb. (N. Y.) 91; *Atkins* v. *Bailey*, 9 Yerg. 111 (Tenn.) are urged in argument for the sureties as sustaining the position that the mere resig-

nation of an officer, regardless of whether the resignation is accepted or not, terminates the term of office. But these cases all involve offices created by law, and not those created merely by contract; and they also involve unconditional resignations. There is a conflict of authority, however, as to how long the liability continues of a surety of an officer holding an office created by law; the conclusions reached in the several jurisdictions depending in large measure upon the existing statutes affecting the subject. 27 Am. & Eng. Ency'l Law (2 Ed.) p. 535; *Coplin* v. *Mc-Calley*, 1 Leigh (28 Va.) 280, 19 Am. Dec. 748. And, it is elementary that a public office, created by law, differs in important particulars from an employment, although the latter be a public employment. As said by Chief Justice Marshall in *U. S.* v. *Maurice*, Fed Cas. No. 15, 747, 2 Brock. (U. S. C. C.) 96: " * * * * * although an office is an employment, it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to perform a service without becoming an officer." But, in view of our conclusion above stated, that the proper construction of the bond in the instant case is that it is a continuing obligation, covering the whole time of the continuous service of the cashier, without regard to how that service may have been divided up into successive contract periods of service, it would be wholly unprofitable for us to enter here upon the various distinctions and considerations which might affect the correctness of our conclusion if this were the case of suretyship for a statutory officer having a term of office fixed by law. Such a case is not here before us.

[3]    For the same reason it is unnecessary for us to consider the various questions, and the authorities cited thereon, raised by the assignments of error and argument of counsel, touching the admissibility or non-admissibility of

oral evidence to show that the cashier's resignation was tendered and accepted, notwithstanding that no record thereof appears in the minutes of the board of directors. Even if such evidence was admissible in this case, because minutes of all the proceedings of the board were not required to be kept in writing (*Goodwin* v. *U. S., etc., Life Ins. Co.,* 24 Conn., 591), or for some other reason (Jones on Ev. sec. 203-4; 7 Am. & Eng. Cas. pp. 1045-6), and if the trial court was in error in refusing to admit such evidence in behalf of the sureties, it was obviously harmless error, in view of the above conclusion with respect to the proper construction of the terms of the bond. If the resignation was tendered and accepted, or the preceding contract of employment of the cashier was otherwise terminated in May, 1914, it is undisputed that another contract of employment, either express or implied, was, *eo instanti,* made between the bank and the cashier, in such a way that his services as cashier were not for a moment interrupted, but were continuous, as aforesaid, from the time the bond was given until the liability in judgment was incurred; and since the bond was, as aforesaid, not limited in its obligation to any particular period of the employment of the cashier short of the cessation of his service as such but covered a continuous liability during the whole term of actual service of the cashier aforesaid, the evidence in question was immaterial.

[4]    The sole question remaining for our decision is the following:

2. Did the release by the receiver, without the consent of the sureties, of the mere personal liability to the bank of R. B. Upshur and his partner, composing the firm of R. B. Upshur & Company, for the overdraft of $1,329.31 for which the cashier was also liable to the bank, release the sureties of the cashier from such liability?

This question must be answered in the negative.

[5, 6]    There are two rules which are well settled: (1) That a release of the principal debtor by the creditor, by an absolute release of the debt, or by an obligatory extension of the time of payment, without the consent of the surety, releases the surety *in toto;* and (2) that a release by the creditor, without the consent of the surety, of any perfected lien or fund or property held by the creditor in such a way that he has the legal right to apply it in satisfaction of the whole or any part of the debt, release the surety *pro tanto, i. e.,* to the extent of the amount which could with certainty, as appeared at the time of the release, have been realized from the security.  32 Cyc. 225; Sheldon on Subrogation, sec. 119, p. 174; *Shannon* v. *McMullen,* 25 Gratt. (65 Va.) 212; *Morton* v. *Dillon,* 90 Va. 595; 19 S. E. 654; *Chichester* v. *Mason,* 7 Leigh (34 Va.) 244; 27 Am. & Eng. Enc'l Law (2nd Ed.) H. 516, 518-520; *Henderson* v. *Huey,* 45 Ala. 276; *Maquoketa* v. *Willey,* 35 Iowa 323; *Bedwell* v. *Gephart,* 67 Iowa 44, 24 N. W. 585.

[7] It is urged in argument for the sureties, that, by reason of the doctrine of subrogation, if the sureties are required to pay the Upshur & Co. debt, they are entitled to be subrogated to the benefit of the rights at one time held by the bank against the individual partners of Upshur & Co. and any property they may accumulate in future, in order to re-emburse themselves; and that the release by the receiver of these rights defeated the sureties of their right of such subrogation and hence released them from liability to pay such obligation; and the following authorities are cited in support of that proposition, namely: *Daniel's Ex'r.* v. *Wharton,* 90 Va. 584; 19 S. E. 170; *Gurnee* v. *Bausemer & Co.,* 80 Va. 867; *Renick* v. *Ludington,* 14 W. Va. 367; *Edgerly* v. *Emerson,* 23 N. H. 555; 55 Am. Dec. 207; *Knighton* v. *Curry,* 62 Ala. 404. But none of these authorities goes in its holding beyond the two rules above mentioned.   None of these hold that the right of subrogation

in such case extends to mere personal collateral obligations. Such was the character of the obligation of Upshur & Co. to the bank. The bank never reduced that obligation to judgment so as to acquire any lien upon property.

There are general expressions in the opinion of the court in the case of *Renick* v. *Ludington, supra* (14 W. Va. 367), which might seem to give color to the contention that the release by the creditor of a collateral personal obligation will release the surety *pro tanto;* but an examination of that case discloses that in truth the rule applied therein is nothing more than the first rule above mentioned. Such rule is there applied to the dealings of a creditor with sureties, but the circumstances were such that the surety, whose obligation was compromised and partially released by the creditor, occupied, as between himself and the other sureties, the relationship of principal debtor to the creditor, and the other sureties the relationship of sureties for such debtor.

The authorities hold that the release by the creditor of a collateral mere personal obligation, even of the principal debtor, and *a fortiori* of such an obligation of some third person, without the consent of the surety, does not release the surety, even *pro tanto*. *Glassier* v. *Douglass,* 32 Conn. 393; *Perrine* v. *Fireman's Ins. Co.,* 32 Ala. 575; 27 Am. & Eng. Enc'l Law (2nd ed.) pp. 516, 518-520.

[8] Concerning what character of collateral securities in the hands of a creditor cannot be released, without the consent of the surety, without releasing the surety from his obligation *pro tanto*, the court, in *Glassier* v. *Douglass, supra* (32 Conn. 393), says this: "The better opinion is that it must be a mortgage, pledge or lien—some right to or interest in property which the creditor can hold in trust for the surety and to which the surety if he pay the debt, can be subrogated, and the right to apply or hold must be absolute." Speaking of the situation where the creditor

has no lien but only the personal obligation of the principal debtor (in that case the promissory note of the principal debtor), the court further says: "* * * the creditor is 'under no obligation to active diligence' and therefore need not commence a suit whatever his opportunity, so if he commence one he is under no obligation to pursue it, for it involves trouble and expense not required of him * * *."

The case will be affirmed.

*Affirmed.*